DUFRESNE, Judge.
This appeal arises from a suit filed on behalf of Adrian Lawrence (Lawrence), plaintiff/cross appellant, against the Department of Transportation and Development (DOTD), defendant/appellant, for damages sustained in a motor vehicle accident. The trial judge granted judgment in favor of Lawrence and against DOTD for the sum of $233,474.85, interest and costs. DOTD appeals the finding of liability and Lawrence appeals quantum. We amend and as amended, affirm.
On August 23,1984, Lawrence was a guest passenger in a pick up truck driven by his supervisor, Douglas Batiste (Batiste). Batiste testified he was employed by Chemical Spray Company from 1980 to 1984 as a supervisor. Lawrence was a member of his crew. Their task was to spray a herbicide to kill weeds.
ROn the date of the accident they were supposed to spray but it rained. They headed home on LA 308 to Thibodeaux, Louisiana from Valentine, Louisiana. Visibility was “real bad” because it rained hard. It was raining so hard he had to get close to the steering wheel in order to see. Batiste was driving a three-quarter to a one-ton pick up truck with a cab on the back. Seated next to him was Troy Jocko. Lawrence was seated next to the passenger door. There were three others in the back of the truck.
There were two tanks bolted to the back of the truck. Each was full and contained 110 gallons of herbicide. When he approached the “S” curve in the road he felt the liquid in the tanks shift. The next thing he noticed the truck was headed downhill. The accident occurred midway between the first and second curves.
*553 Batiste and Lawrence both testified Batiste was traveling 35 miles per hour. Batiste estimated the speed limit in the curve to be no more than 45 miles per hour. His testimony regarding the speed limit was corroborated by Steven C. Strength whose deposition was introduced into evidence. Strength, the District Operations Engineer for District 02 for DOTD, testified in 1984 to the present the advisory speed limit in the curve has been 35 miles per hour.
Lawrence testified the condition of the road has not changed since the date of the accident.
Batiste stated he had traveled this road with a loaded truck before the accident on a number of occasions and had never lost control before. At the time of the accident he had driven for the company approximately six months. Although he had not driven a Isloaded truck in blinding rain before, he had driven a loaded truck when the road was wet with no problems.
When he came into the curve, he stated, “the tail end” of the truck began to slide a little toward his right. He tried to straighten the truck by turning the wheel to the right.
The tires on the right got off the highway; there was no shoulder. There was only a steep embankment. He stated, “the tires wouldn’t bite and down we went.”
The truck was out of control and went rolling downhill. It came to rest on the passenger side. Both Batiste and Jocko were on top of Lawrence. The truck caught on fire almost immediately after the men climbed out a window. All three men were taken to the hospital by ambulance.
Bobby Hebert testified he was District Maintenance Engineer from October 1990 until January 1994 for DOTD. In 1984 he was the project engineer in charge of construction on LA 308. This project involved a resurfacing and a widening of the roadway. It was an overlay project. He stated the location of the accident was the only place where the road was five to six feet above the surrounding area. The road was originally built on a levee; however, this section was not knocked down. After the 1984 eonstruction there was only a minute shoulder possibly less than one foot. He has personally seen motorists running into the Bollinger Shipyard fence “a lot of times.” He did not know the reason. He has also seen cars run off the road on either side. He opined that there were people who did not follow the Uadvisory speed limit of 35 miles per hour and sped while on the curve.
Hebert testified that at least since 1938 this road has always been a state road maintained by the state. The road was first a dirt road. Shells were later added. He learned that in 1953 the road was hard surfaced.
• The trial judge concluded the driver of the vehicle was partially at fault but did not quantify this fault since it was fault attributable to the employer. The judge also found the condition of the road constituted an unreasonable risk of harm. He awarded Lawrence damages for low back and neck injuries. He found that Lawrence was unlikely to return to work in the manual labor field in the future.
On appeal, DOTD specifies the following errors:
1. The trial court erred in finding DOTD liable for plaintiffs injuries, and
2. Assuming arguendo that DOTD is liable for plaintiffs injuries, DOTD is only partially liable because of the Louisiana Comparative Fault Standard.
FAULT OF EMPLOYER
The trial judge concluded the non-party driver of the vehicle, Batiste, was partially at fault. However, he did not apportion Batiste’s fault because Batiste was a co-employee.
DOTD alternatively argues that if it is liable then it is only partially liable because of the comparative fault of the co-employee. The Supreme Court has recently held in Cavalier v. Cain’s Hydrostatic Testing, Inc., 94-1496 (La. 6/30/95), 657 So.2d 975, 982-984:
We conclude that while quantification of the | ¿fault of a non-party settling tortfeasor is entirely appropriate and was probably contemplated by La.Code Civ.Proc. art. 1812C, quantification of the fault of an *554 employer is not necessary or appropriate under Article 1812C in an action against a third party tortfeasor.
* * * * * *
We reconsider and reject the holding in Gauthier [v. O’Brien, 618 So.2d 825 (La.1993) ] relative to mandatory quantification of employer fault. Neither the pre-1987 nor the post-1987 version of Article 2324B requires the quantification of employer fault.
* * * * * *
We therefore overrule the holding of Gauthier that quantification of employer fault either is suggested by La.Code Civ.Proc. art. 1812C or is made mandatory by La. Civ.Code art. 2324B.
In Cain, as in the instant ease, the plaintiff was not contributorily negligent. The court concluded that since the employer’s fault should not be quantified there was only one blameworthy party. That party was liable for 100% of the plaintiffs damages.
DEFECT
The following experts evaluated the accident area: Dr. Robert Lipp, Dr. Olin K. Dart, Jr., and Richard Glenn Robertson. All three experts agreed the slope was a hazard to motorists.
Dr. Dart measured the slope in the area of the accident. The slope was 2 to 1 or 1½ to 1, which is a nonnegotiable slope. This slope was far too steep. There was essentially a two-foot shoulder which is not desirable. He explained the reason it was hazardous was | (¡because there was no room to maneuver back onto the road it a motorist strayed from the highway.
The testimony established there were no national nor state standards in 1953 when this road was hard surfaced. Nevertheless, Dr. Lipp, an expert in the field of Civil Engineering and Accident Reconstruction, testified that based on good engineering judgment the high embankment created a hazard if anyone got off the road.
In Perez v. State, Dept. of Transp. & Dev., 578 So.2d 1199 (La.App. 4th Cir.1991), writ denied, 581 So.2d 706 (La.1991) a motorist was unable to return to the highway due to a six to an eight-inch drop in the shoulder. The court concluded the sloping and unstable shoulder was a defect. The plaintiffs/motorist’s vehicle went into a canal. There was a one to two and a half foot shoulder consisting of loose shells. The depth of the drop prevented a car from recovering.
When the highway was constructed in 1924 there was no standard. Throughout the years the highway had not been redesigned. Only an overlay was added and restoration of the shoulder due to storm damage was made.
The court, after concluding the slope constituted a defect, also found the state had breached its duty to maintain an unstable shoulder. It held at 1204:
An abrupt drop from a road to a shoulder is a defect. Grappe v. State, DOTD, 462 So.2d 1337 (La.App. 3rd Cir.), writ denied 466 So.2d 1302 (La.1985). The duty to maintain reasonably safe highways and shoulders does Rnot require that a shoulder be widened to meet current standards of four to eight feet; however, that duty does require the State to keep a shoulder stable and level with the roadway. Sinitiere v. Lavergne, 391 So.2d [821 (La.1980) ] at 825.
The issue in the present case is whether the state had a duty to erect a barrier to prevent a vehicle from rolling over the steep embankment. There was conflicting testimony in this regard.
We note that DOTD argues on appeal the failure of of DOTD to reconstruct the highway to meet modern standards does not establish a defect. That same argument was addressed by this court in Begnaud v. Dept. of Transp. & Dev., 93-639, 93-640 (La.App. 5th Cir. 1/12/94), 631 So.2d 467, writ denied, 94-0367 (La. 3/25/94), 635 So.2d 230.
We explained at 469:
DOTD argues that the trial court incorrectly applied the holdings of Myers [v. State Farm Mutual Auto. Ins. Co., 493 So.2d 1170 (La.1986) ], supra, and Dill v. DOTD, 545 So.2d 994 (La.1989) to the facts in this case. In its brief, DOTD states that the trial court correctly cited Myers, *555 supra, and Dill, supra, for the proposition that the failure of DOTD to reconstruct an old highway to meet modem standards does not in and of itself establish the existence of a hazardous defect. The trial court, in its reasons for judgment, correctly pointed out that the holding in Myers, supra, did not relieve DOTD from its duty to keep the highways and shoulders in a reasonably safe condition. In Dill, supra, the Supreme Court of Louisiana clarified the holding by stating that Myers does not stand for the proposition advanced by DOTD that it can escape liability simply by showing that a highway met the existing standards when it was built. As correctly pointed out by the trial court in its ^reasons, the liability of DOTD is determined on the basis of whether the condition of the highway constituted an unreasonable risk of injury which caused the accident. The trial court then proceeded to consider the condition of the roadway, the shoulder of the roadway, and other facts, to determine whether an unreasonable risk of harm existed which caused this accident. As pointed out by Dill, supra, design standards at the time of original construction and at the time of the accident may be relevant factors in deciding this issue, but are not determinative of the issue.
BARRIER
Strength testified he visited the site recently and noticed a very narrow shoulder. There was no place for him to pull over in order to look at one of the signs. He stated:
on any slope that exceeds a four-to-one drop-off, we put guard rails on those.
On new construction guard rails would be installed; however, he was unfamiliar with whether this applied to older roads. He testified that it would be very difficult for a motorist on this curve to recover and steer a vehicle back onto the highway if it strayed beyond one or two feet off the road. Depending on the speed of the car a motorist would probably recover if it strayed within a foot or two. Beyond that “it would be very difficult.”
Dr. Lipp testified Louisiana has adopted the standards of the American Association of State Highway and Transportation Officials (AASHTO). He explained that AASHTO’s 1977 standards state that:
with the slope and the conditions that are in effect in this particular embankment, we should have had a barrier to protect people from falling off the side of |9the road.
With a slope, as in this case, of greater than two to one, a barrier is needed. This is because if a vehicle is off the slope it is “almost certain to tip” over. When the vehicle rolls over, this accident will become life threatening.
Every specification Dr. Lipp has seen both before the accident date and afterwards state a barrier is needed in this situation. Even in the past good engineering practice required a railing in this particular case. He explained:
In this particular case it warrants a barrier to keep people on the highway, to keep the vehicle — if you fail to keep onto the paved portion of the highway, you’re going to tip the vehicle over, almost certainly. So, you really need a barrier to keep you on the road.
Dr. Lipp did not know why the road was built on an embankment. He saw no reason why it should have been this way in 1953.
On cross examination he was asked whether the 1977 AASHTO standards would have required the state to place a guardrail at this location. He thought it was discretionary and basically a judgment call. He stated that with the embankment height being about six feet high and the slope being two to one or greater a barrier was highly desirable and would probably save lives. The barrier would keep motorists from rolling over.
He admitted that if a guardrail is too close to the highway it could be more dangerous than one without it. However, the guardrail 1 ipcould be constructed in a curve so that a motorist would not “hit it end on.”
On the curve in question the guardrail could be placed about one-foot from the highway. The guardrail would be placed so that a vehicle would always be deflected back onto the highway.
*556 He was asked whether the guardrail in projecting a vehicle back to the highway would create a hazard to other vehicles. He stated there is always a chance the motorist could control the vehicle and stay in the proper lane. He explained the guardrail could be designed and placed so as not to cause a head-on collision.
He stated that even if the driver of the truck left the road after the shell road location this area would still warrant as desirable, a guardrail because it was still rather steep.
He testified that the road was not unreasonably dangerous at 85 miles per hour unless a driver lost control of a vehicle. Since there is no shoulder it becomes “very dangerous.” In this ease there was negligible area to recover.
He did not know in 1953 when this former shell road was hard surfaced whether there were any available standards. However, he stated the absence of standards does not lesson the hazard. Based on “engineering judgment” the high embankment creates a hazard if anyone gets off the road.
He thought in 1984 when the state overlaid the road it could have easily erected a barrier from a financial perspective. If the state were to remove the embankment that would have been a large task.
|uHe concluded the guardrail would have prevented the severity of the accident. The barrier would have prevented him from overturning. It would not have prevented him from initially losing control.
On redirect he stated guardrails are designed to have the vehicle continue along the guardrail rather than to deflect the vehicle across to the other lane.
When this road was built in 1953 it violated good engineering practices.
Noel Kent Israel, a DOTD engineer in the highway design department, testified DOTD had no standards in 1953 when this road was hard surfaced. He thought the installation of a guardrail would cause greater harm. A guardrail at that location would not be too costly.
Dr. Dart testified he felt a guardrail would reduce the risk of a hazard. This would not require major reconstruction. It would only require a modification of the embankment. Guardrails are not supposed to project a vehicle across the highway.
Robertson testified the slope was a nonrecoverable slope which could possibly cause a vehicle to roll over. He admitted the area does warrant the placement of a guardrail but stated this was not mandatory. He also viewed the guardrail at this location as a hazard which would redirect traffic onto oncoming traffic. Robertson felt that in order to place a guardrail the area would have to be reconstructed. He was of the opinion, however, that the critical slope was not the cause of the accident. Robertson attributed the cause to the driver’s | ^failure to maintain control.
The trial judge had ample evidence to support his conclusion DOTD had a duty to maintain the highway and could have placed a barrier or guardrail at that location as a safety measure without incurring excessive costs. We find no manifest error in his findings based on his weighing the credibility of the witnesses. Rosell v. ESCO, 549 So.2d 840 (La.1989).
QUANTUM
Lawrence argues the trial judge was clearly wrong in awarding only $50,000.00 for past and future lost wages and in awarding only $100,000.00 for pain and suffering. He seeks $390,000.00 for past and future lost wages and $200,000.00 for pain and suffering.
Trial began July 26,1994. At trial counsel stipulated the amount of past medical bills to be the amount contained in the stipulation with the intervenor: $23,474.85. The trial judge awarded $33,474.85 in medical benefits; $100,000.00 in pain and suffering; $50,000.00 in loss income, and $50,000.00 for loss of enjoyment of life.
Lawrence testified he dropped out of high school in the 11th grade and did not receive a G.E.D. His income the year prior to the accident was $10,000.00.
He stated he was taken to St. Ann’s Hospital by ambulance after the accident. He *557 stayed two days. Dr. Morris treated him for neck and back injuries. He later saw Dr. Vogel approximately four times. He next saw Drs. Bullard, Bardello and LaRocca.
| igDr. LaRocca hospitalized him three times. He ultimately had surgery at Elm-wood Medical Center in 1987.
Lawrence has been on social security disability four to five years. He has not returned to gainful employment since the accident.
Regarding lost wages, the only other evidence introduced was a stipulated economic report by Dr. Melville Z. Wolfson. However, that report is based on Lawrence’s being disabled and unable to return to gainful employment. It is also based on this disability having been caused by the accident. The trial judge, in awarding $50,000.00 for loss wages, evidently concluded that the total amount reported by Dr. Wolfson was not entirely attributable to this accident. That finding is supported by the testimony of Dr. Bruce Razza. However, we find an abuse of discretion in the trial judge’s failure to adequately attribute loss of wages due to the injuries suffered in this accident. While we find no abuse in the trial judge’s failure to adopt Wolfson’s calculation of $390,000.00 for lost wages, we find an abuse in his only awarding $50,000.00 for loss wages.
Dr. Bruce Razza, an expert in orthopedic surgery, testified he saw Lawrence once on June 13,1991. Lawrence had been a patient of Dr. LaRocea’s. Dr. Razza was associated with Dr. LaRocca before his death. Dr. LaRocea’s medical records were introduced. Dr. Razza reviewed these and explained them at trial.
Lawrence first saw Dr. LaRocca September 29,1986. He complained of chronic neck and back pain from an accident on August 23, 1984.
114Pr. LaRocca treated him conservatively for the neck problem but operated on his low back. Lawrence had a lumbar laminectomy and fusion in July 1988. Afterwards his symptoms improved but he still had “some significant low back and left leg pain” as well as left knee pain.
Dr. LaRocca performed “facet blocks, or cortisone injection procedure to the joints of the cervical spine.” Dr. LaRocca felt he may need a cervical fusion in the neck.
When Lawrence saw Dr. Razza in 1991 he complained of neck pain, back pain, leg, and knee pain. Daily living activities aggravated these symptoms. Dr. Razza recommended further tests.
He assigned Lawrence a 10% anatomic impairment of his whole body as a result of the low back problem. He considered him functionally limited in that he recommended he avoid the following:
repetitive lifting, bending, squatting, stooping, climbing, prolonged standing or sitting, prolonged or repetitive bending of the head and neck, or sue of the upper extremities above shoulder level. So, functionally, those would be considered disabling activities.
He restricted repetitive lifting to 15 to 20 pounds and infrequent lifting to 40 or 50 pounds.
Without the recommended tests he could not give a specific prognosis as to additional treatment or surgery. He could say that based on no resolution of long term symptoms his prognosis was guarded for a complete or spontaneous resolution of his symptoms.
At the time he saw him he diagnosed him as having symptomatic | iglumbosacral spinal pain. The back problem could be:
“Incomplete union, or residual scar formation, or residual degeneration in the lower back area, or residual impingement, an adjacent level disc or joint problem.”
Regarding the neck, he felt there was some degeneration and diagnosed him as having symptomatic spondylosis.
He was uncertain whether the knee pain was referred from the back or whether there was a problem in the knee joint.
He doubted that even with surgery there would be a significant change in the residual functional restrictions.
Dr. Gregory J. Volek, a chiropractor, testified he first examined Lawrence September 9, 1985. He found sprain-strain injuries to *558 the neck and low back. He last saw him November 13, 1985. His reports of painful areas correlated with the thermography test he performed. He also noted spasm. Dr. Volek related Lawrence’s symptoms to the accident. At the time he saw him he had had ongoing symptoms for about a year. He thought it likely he would have continuation of these problems in the foreseeable future.
There was no other evidence in the history of any other traumatic injury. As far as he knew Lawrence was not gainfully employed. At the time he saw him he would not have recommended he return to gainful employment.
Dr. Volek established a causal relationship between strain-sprain injuries of the neck and back and the accident. Lawrence testified he was hospitalized three times for these problems and ultimately had | ^surgery in 1987. Dr. Razza found a myriad of symptoms, including knee and degenerative disc problems for which he gave no conclusion as to causation. While the trial judge correctly concluded causation had not been established for all of the symptoms reported by Lawrence; nevertheless, it is uncontradicted that Lawrence cannot return to manual labor due to the weight restrictions to his neck and back. Since Lawrence has lost the capacity to do manual labor, we find the lowest point reasonably within the trial judge’s discretion to be $100,000.00 for lost wages. See Usé v. Usé, 94-0972 (La.App. 1st Cir. 4/7/95), 654 So.2d 1355.
Regarding general damages, the Louisiana Supreme Court has explained in Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, — U.S. -, 114 S.Ct. 1059, 127 L.Ed.2d 379:
The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Nevertheless, the theme that emerges from Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963) through Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), and through Reck [v. Stevens, 373 So.2d 498 (La.1979) ] to the present case is that the discretion vested in the trier of fact is “great,” and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular ease. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
| ^Applying this standard, we find no abuse of discretion in the trial judge’s awarding $100,000.00 for pain and suffering.
Accordingly, for the reasons stated, the judgment is amended to award $100,000.00 for lost wages. The judgment is affirmed in all other respects.

AMENDED, AND AS AMENDED, AFFIRMED.